NEW YORK LIFE INS. CO. v. HAGLER et al. (No. 1336.) †

(Court of Civil Appeals of Texas. Texarkana. June 24, 1914. On Motion for Rehearing, Oct. 15, 1914.)

1. INSURANCE (§ 241*)—CAPACITY TO CONTRACT —INSANE DELUSION.

Where insured, having several life policies payable to his estate, and having the mental capacity to know the nature and effect of his contracts, was induced, by an insane delusion that his children meant to murder him for his insurance, to surrender the policies to the insurer on payment of their value, such surrender was voidable and subject to vacation by insured's personal representatives after his death.

[Ed. Note.—For other cases, see Insurance, Cent. Dig. § 520; Dec. Dig. § 241.*]

On Motion for Rehearing.

2. INSURANCE (§ 367*)—ILLEGAL SURRENDER —TERM INSURANCE—ENFORCEMENT.

Where insured without sufficient mental capacity surrendered certain life policies, providing that in case of a failure to pay the premiums when due the policies should automatically become valid for a specified short term, insured having died after such surrender and the surrender having been set aside by his personal representatives, the trial court should have treated the policies as for the definite term specified in accordance with such provision.

[Ed. Note.—For other cases, see Insurance, Cent. Dig. §§ 935, 938; Dec. Dig. § 367.*]

3. INSURANCE (§ 602*)—LIFE POLICIES—ILLEGAL SURRENDER—VACATION—DEATH OF INSURED—PROCEEDS OF POLICY—FAILURE TO PAY—ATTORNEY'S FEES.

Where insured, while suffering from an insane delusion, surrendered his life insurance policies, and subsequently died, whereupon his personal representatives elected to rescind such surrender, and brought suit to vacate the same and recover on the policies, defendant, having refused to pay the proceeds after such rescission, became liable for damages and attorney's fees, under Vernon's Sayles' Ann. Civ. St. 1914, art. 4746, providing that where a life insurance company liable for a loss fails to pay the same within 30 days after demand, it shall be subject to a penalty and to the payment of reasonable attorney's fees.

[Ed. Note.—For other cases, see Insurance, Cent. Dig. § 1498; Dec. Dig. § 602.*]

4. INSURANCE (§ 602*)—LIFE POLICIES—FAILURE TO PAY—ATTORNEY'S FEES.

Where insured, while insane, canceled three policies of life insurance, and after his death, his personal representatives were compelled to bring suit to reinstate the policies, and to recover thereon, in which it was held that plaintiffs were entitled to recover $19,876.23, together with a penalty of 12 per cent. thereon and attorney's fees, a verdict fixing such fees at $5,000 was not excessive.

[Ed. Note.—For other cases, see Insurance, Cent. Dig. § 1498; Dec. Dig. § 602.*]

Error to District Court, Tarrant County; R. H. Buck, Judge.

Action by David S. Hagler and others against the New York Life Insurance Company. Judgment for plaintiffs, and defendant brings error. Reformed and affirmed.

November 30, 1909, John S. Hagler, in consideration of the surrender value thereof then paid to him, delivered to plaintiff in error for cancellation four policies, insuring his life for the benefit of his estate. One of the policies was for $10,000, and the other three were for $5,000 each. Had each of the policies remained in force and its terms been complied with, the one for $10,000 would have matured into a paid-up policy January 15, 1920, and each of the others would have matured into a paid-up policy September 3, 1922. At the time the policies were surrendered and canceled each of the three for $5,000 had lapsed for nonpayment of premiums due thereon September 3, 1909, and each, in accordance with its terms, had been "continued for the reduced amount of $4,285 for a term of 2 years and 2 months from September 3, 1909, to November 3, 1911." John S. Hagler died August 7, 1911. Defendants in error, hereinafter referred to as plaintiffs, were the administrators of his estate, and as such sought by this suit, commenced December 28, 1911, to annul the contract whereby Hagler surrendered the policies and same were canceled, and to recover of plaintiff in error, hereinafter referred to as the company, the amount of the policies, 12 per cent. thereon as damages and $7,500 as attorney's fees. As a reason why the contract should be set aside as prayed for plaintiffs alleged that Hagler, at the time he made it, "was incapable of making said contract. or contracts, he being at said times an insane person and non compos mentis, and was, by reason of such insanity and the diseased condition of his mind, incapable of exercising rational judgment in the matter of contracting for the cancellation of said policies of insurance," and that said Hagler "was experiencing and suffering from insane and false delusions to the effect that he was in danger of being murdered, which delusions were the cause of his surrendering and canceling said policies of insurance; and, but for the insanity of said John S. Hagler and his said insane delusions, he would not have surrendered said policies but would have kept them in force until his death." On issues submitted to them the jury found· (1) That at the time Hagler surrendered the policies for cancellation there was an estrangement between him and his children. (2) That such estrangement was wholly unjustified on his part by any conduct of his children toward him. (3) That at the time Hagler surrendered the policies he feared he would be murdered by persons who would obtain the benefit of the policies, if same were in force when he died. (4) That this fear was not well founded, but arose from an insane delusion. (5) That said delusion was the direct and proximate or controlling cause of his surrender of the policies for cancellation. (6) That he would not have so surrendered the policies if he had not been laboring under such delusion. (7) That the company did not have actual knowledge that Hagler, when he surrendered the

policies was laboring under such a delusion, and that same was the controlling cause of his desire to surrender the policies, but did have constructive knowledge thereof; that is, it had knowledge of such facts as would put a reasonably prudent person upon inquiry, which, pursued as a reasonably prudent person would have pursued same, would have resulted in knowledge of the facts involved in the inquiry. (8) That Hagler knew, at the time he surrendered the policies, that he was doing so in consideration of a cancellation of the loans outstanding thereon and of the sum of money that was then paid to him, and knew that the effect of such surrender was to deprive him and those who might claim under him of all further rights under such policies. (9) That Hagler never, at any time after he surrendered the policies told either of his children he had surrendered same. (10) That his surrender of the policies was due to a fear that his children would murder him for same, and to a desire to remove the motive for their so doing; that the surrender of the policies was due to an estrangement between him and his children produced by an insane delusion, and not to financial considerations; that such surrender of the policies was due to two motives—one to remove the incentive to murder him, and the other to deprive his children of the benefit of the policies. (11) That subsequent to the time he surrendered the policies Hagler never recovered his sanity and was not free from said delusion. (12) That $5,000 was a reasonable attorney's fee, not contingent in any way upon the result of the litigation, for the prosecution of the suit. On the findings just recited and others made by the court, judgment was rendered in favor of plaintiffs against the company as follows: Annulling the contract whereby Hagler surrendered the policies for cancellation; reinstating the policies and declaring same as reinstated to be as valid and binding on the company as they were before they were canceled on November 30, 1909; for $13,180 as the sum due on the three policies for $5,000 each; for $9,310.31 as the sum due on the other policy; for $2,698.88 as the damages plaintiffs were entitled to; and for $5,000 as attorney's fees they were entitled to—making a total of $30,189.58.

Locke & Locke, of Dallas, and James H. McIntosh, of New York City, for plaintiff in error. Flournoy, Smith & Storer, of Ft. Worth, for defendants in error.

WILLSON, C. J. (after stating the facts as above). [1] The first question arising on the findings of the jury and presented by the assignments, may—fairly, we think—be stated as follows: Should it be said that the mind of a person who knows the nature and effect of a contract, whereby he agrees to the cancellation of policies insuring his life for the benefit of his estate, but who is im-

pelled to so agree by an insane delusion that his children mean to murder him to obtain the benefit of the insurance, is so unsound as to render him incapable of binding himself by the contract? The company insists the question should be answered in the negative, and cites, as supporting its contention, cases like Gee v. Johnson, 142 S. W. 625 (holding that the test of mental capacity to contract is the ability to understand the nature and effect of a contract in question), and cases like Mathews v. Nash, 151 Iowa, 125, 130 N. W. 796 (where the Supreme Court of Iowa said: "If delusions be relied upon, it must be shown that they influenced the party to such an extent that he had no reasonable conception or understanding of the true nature and terms of the contract"), Du Bose v. Kell, 90 S. C. 208, 71 S. E. 376 (where the Supreme Court of South Carolina approved a statement by the trial judge as follows: "Mere infirmity of mind or body, not amounting to an incapacity to understand the nature and consequence of the act done, will not render a person incapable of executing a valid deed. Nor will monomania or delusion existing in the mind of the grantor affect the validity of a deed, unless it be such as to actually influence his mind in the very transaction in question by rendering him incapable of appreciating the true nature and effect of the particular act in controversy"), and Jenkins v. Morris, 14 Ch. Div. 674 (where an English court held merely that, notwithstanding a party seeking relief against a contract was, at the time he made the contract, laboring under an insane delusion with respect to the subject-matter of same, it was still a question for the jury to say whether he was mentally incapable of binding himself or not, one of the judges saying: "The delusion may be trivial, and whether so or not the conviction of a jury or judge may, unless forbidden by law, be that it did not affect the disposition").

Plaintiffs, on the other hand, assert that, where the insanity relied upon consists of insane delusions, the test is, "Did such insane delusions cause the act?" and cite, as supporting their contention that the answer to the question stated above as based on the findings of the jury should be in the affirmative, cases like Meigs v. Dexter, 172 Mass. 217, 52 N. E. 75 (where the Supreme Court of Massachusetts approved as correct an instruction in part as follows: "The question is whether that insane delusion, if a person has it, is a moving cause to some act which would not have been done except for that delusion," and which renders the person of unsound mind in respect to that thing), Dewey v. Allgire, 37 Neb. 10, 55 N. W. 278, 40 Am. St. Rep. 468 (where the Supreme Court of Nebraska said: "It has been repeatedly held that the deed of one afflicted with monomania may be set aside where the execution of the deed was induced by the disease"), and Kastell v. Hillman, 53 N. J. Eq.

49. 30 Atl. 535 (where the New Jersey Court of Chancery said, in effect, that the facts that Kastell, maker of the deed, knew he was conveying the property to his two grandchildren, that he desired to do so, and was satisfied with the act, was not all that was to be considered in disposing of the attack made on the deed by his son, on the ground that Kastell acted under an insane delusion that he [the son] had swindled him). In stating the opinion of the court, Vice Chancellor Pitney said:

"Mr. Kastell entertained and expressed a reason for making this conveyance, and I think its validity must depend, in a measure, upon the question whether that reason was such a one as could be entertained by a sound and healthy mind, or whether it was in itself unreasonable, and the result of a weak childish, morbid, and diseased mind."

We do not agree that the quotations made from the opinions in the Nash and Kell Cases correctly state the law, unless the courts rendering the opinions intended to be understood as meaning that the power of a person to reasonably understand the nature and effect of a contract involves power on his part to choose whether he will execute it or not.

We see no reason why a diseased condition of the mind which impels a person to make a contract he otherwise would not make should not be held to operate as effectually to avoid the contract as would a diseased condition of the mind which prevents such person from understanding the nature and effect of such contract. If the purpose of the law is to protect persons so far deprived by disease of their normal mental faculties as to be unable to protect themselves, that purpose would fail of accomplishment if relief were refused to one who understood, in the ordinary sense of the word, the nature and effect of a contract, yet was impelled by an insane delusion to enter into it, when but for the delusion he would not do so.

The company's contention that the findings of the jury should be interpreted as meaning that Hagler was competent to make the contract in question, because same show that he understood the nature and effect thereof, is based on the assumption that the finding that Hagler was impelled by an insane delusion to make the contract can be referred only to his motive in making it. It is argued that if it appears that a person understood what he was doing when he entered into a contract, the law does not, in the absence of fraud, concern itself about the motive actuating him to enter into it. This, we think, is true, unless it also appears that the motive originated in and was sustained by a diseased mind. If it so originated, is so sustained, and impels a person to make a contract he otherwise would not have made, we think he should permitted to avoid it, for the same reason he might avoid it if made at a time when, because of mental disease, he was unable to understand its nature and effect, to wit, his inability, due to a diseased mind, to intelligently protect himself.

The agreement covering the surrender of the policies for cancellation was evidenced by correspondence between Hagler at Ft. Worth and the company—first at New York, and later at St. Louis. A succinct, and we think correct, statement of that correspondence is in the briefs filed by the company, and is as follows:

"In Mr. Hagler's first letter, written August 13th, he inquired as to the cash value of each of his policies. In the company's reply, written from its New York office August 27th, it stated the sums which it would be willing to allow for the surrender of the various policies, 'conditioned, of course, upon our being furnished with satisfactory release,' the offer to remain open for 30 days. In Mr. Hagler's letter of August 30th he stated that he thought he would be able to furnish any release the company might demand, and requested that it prepare one and send it to him, and said that, upon receipt of the same, if satisfactory, it might remit him the sum offered by it. In this letter he explained his present status as to guardianship and restoration of sanity. In the company's reply of September 11th it stated that it would require an authenticated copy of an order of court discharging him from guardianship and certifying that he was mentally competent. At or about the same time it referred him to its St. Louis office for further correspondence. In his letter of September 24th Mr. Hagler sent the company's St. Louis office a certificate from the county clerk, which he said he thought would answer the company's requirements, stated that he had decided to accept the company's offer and surrender his policies, and requested that it send him such receipts as it desired. October 20th the company's St. Louis office wrote him inclosing forms of termination receipts and also forms of reinstatement papers, and urging him to keep his policies in force. In this letter he was requested, in case he should decide upon cashing the policies, to send in the termination receipts duly signed, and to return the duplicates of loan agreements in his possession, together with all his renewal receipts. November 1st Mr. Hagler wrote to the St. Louis office, inclosing the signed termination receipts, but not the duplicate loan agreements, or, apparently, the renewal receipts. November 16th the St. Louis office replied, reminding him of his failure to return the duplicate loan agreements, and sending him an additional receipt for a refund of unearned interest which was to be paid him. November 19th Mr. Hagler sent the St. Louis office the receipt for refund of interest, but indicated that he did not understand what was meant by the duplicate loan agreements. November 22d the St. Louis office replied, explaining what the duplicate loan agreements were and why they were wanted, and stating that if he were unable to find them, he might prepare a certificate to that effect and send it in, and the company would give it attention. November 24th Mr. Hagler sent to the St. Louis office a certificate, prepared and signed by himself, to the effect that the loan agreements had been lost. The St. Louis office, having accepted the certificate as a satisfactory substitute for the duplicate loan agreement, and apparently having waived the requirement for the return of the renewal receipts, mailed Mr. Hagler checks in payment of the cash surrender value of his policies on November 30th."

The company insists that:

"There never was any binding agreement of surrender until the certificate that the duplicate

loan agreements whose return was required by the company had been lost was itself received by the company and accepted by it. That this took place in St. Louis on November 30, 1909, and was the final act which signified and completed the entrance of the parties into a contract."

The company further insists that the agreement, therefore, was a Missouri contract, and that:

"Questions relating to its validity, including those relating to the capacity of the parties thereto, are determinable by the laws of Missouri."

It further insists that "by the law of Missouri a contract fairly made with an insane person not under guardianship is so far valid that it will not be set aside unless the parties can be restored to their original status"; that such a restoration, because of the death of Hagler, is impossible, and therefore that, under the law of Missouri, plaintiffs were not entitled to have the contract canceled, the policies reinstated, and to recover on them as the court below determined they were. The argument is that "the uncertainty, that is to say the risk, is an indispensable element of any contract of legitimate insurance." The element of uncertainty entering into the contracts of insurance, existing at the time the policies were canceled, and which cannot be restored to them, to which the company refers, is, of course, the uncertainty existing at the time the policies were canceled as to how long Hagler would live. As supporting its contention that, because the element of uncertainty referred to cannot be restored to the contracts of insurance, it cannot be placed in the position it occupied at the time the policies were canceled, the company refers to an English and to a Canadian case, and to Johnson v. Ins. Co., 56 Minn. 365, 57 N. W. 934, 59 N. W. 992, 26 L. R. A. 187, 45 Am. St. Rep. 473. We have not had access to the reports containing the English and Canadian cases, but have examined the Johnson Case. There it appeared that Johnson, while a minor, had the insurance company to issue to him a policy insuring his life, and paid four annual premiums as they accrued thereon. When he became 21 years old he elected to rescind the contract of insurance, and sued to recover the sums he had paid as premiums while he was a minor. The policy provided that after the payment of three or more annual premiums the insured was entitled to a paid-up, nonparticipating policy for as many twentieths of the original sum insured ($1,000) as there had been annual premiums paid. The court, it seems, held that Johnson, on a rescission, was not entitled to recover back the sums he had paid as premiums, because he had had the benefit of the insurance while a minor, and could not restore same to the insurance company, but was entitled, on surrendering the original policy, to a paid-up, nonparticipating policy for $200 (four-twentieths of the

face of the original policy), and to recover of the company the cash surrender value of such a policy. As we understand it, the case is clearly distinguishable from the one before us. Plaintiffs here are not seeking to recover back something paid by Hagler for benefits he or they received. They tendered back to the company "all moneys received by Hagler, with interest, and all premiums falling due, with interest," and insist that:

"When the company was actually allowed credit for these sums and the policies were reinstated, it was in precisely the same situation as if the trade with the insane person had never been made."

Viewing the matter from a practical standpoint, as we think it should be viewed, we think plaintiffs' contention should be sustained. Having reached that conclusion, it is unnecessary to inquire whether the agreement covering the cancellation of the policies was a Missouri contract or not, nor, if it was such a contract, whether the law of that state applicable to the case is as the company claims it is or not. For, if it should be treated as a Missouri contract, and if the rights of the parties should be determined with reference solely to the law of that state, and if that law is as the company asserts it to be, it would support the finding of liability on the part of the company if, as we have concluded is true, the company could be and has been restored to the position it occupied at the time the policies were canceled.

The company further insists that plaintiffs were not entitled to recover anything against it as damages and for attorney's fees. The recovery had on that account was based on a statute as follows:

"In all cases where a loss occurs and the life insurance company, * * * liable therefor shall fail to pay the same within thirty days after demand therefor, such company shall be liable to pay the holder of such policy, in addition to the amount of the loss, twelve per cent. damages on the amount of such loss together with reasonable attorney fees for the prosecution and collection of such loss." Vernon's Stat., art. 4746.

We think the contention should be sustained. The contract canceling the policies was valid until set aside, and the company had a right to so treat it. Plaintiffs were not holders of the policies, within the meaning of the statute, while the contract canceling them was in force. They never became such holders until the policies were reinstated as a result of the cancellation of the contract whereby they were surrendered. As the reinstatement of the policies was a prerequisite to plaintiffs' right to recover on them, we think their suit, in determining the question as to their right to recover damages and attorney's fees provided for by the statute, should be viewed as one primarily to annul the contract whereby the policies were surrendered, and to reinstate same.

The court below thought plaintiffs were entitled to interest on the sums he found to be due on the policies from January 2, 1912, the date when plaintiffs demanded payment of the policies. The company insists, and, for reasons stated above, we agree, it was not liable for interest on the sums recoverable on the policies before the time they were reinstated; that is, before the date of the judgment of the court below.

The judgment will be so reformed as to adjudge a recovery in plaintiffs' favor of the sum of $12,373.74, instead of $13,180, on account of the three policies for $5,000 each, and of the sum of $6,899.55, instead of $9,310.31, on account of the policy for $10,000, or a total of $19,273.29, instead of $30,189.58, and interest thereon from January 20, 1913, on account of the four policies, and as to deny to plaintiffs a recovery of any other or further sum on account of said policies, and as so reformed the judgment will be affirmed. The costs of the court below will be paid as adjudged by that court. The costs of this appeal will be adjudged against plaintiffs.

## On Motion for Rehearing.

Had the contract covering the surrender and cancellation of the policies never been entered into, and had Hagler failed to pay the premium which, in that event, would have fallen due on the $10,000 policy January 15, 1910, that policy by its terms would have become, as the others had become, a policy for a term of years (three years and eight months) instead of a policy for the then indeterminate period of Hagler's life, and the beneficiaries, at Hagler's death during that period, would have been entitled to demand and receive of the company only the principal sum ($10,000) stated in the policy, less loans made thereon, instead of said principal sum and one-half the sum of the premiums which had been paid thereon, less loans made on same. The trial court by his judgment annulled the contract referred to, and reinstated the policies as obligations as binding on the company as they were before said contract was entered into. We were, and are, of the opinion that said judgment, so far as stated, was correct. But, having reinstated the policies, the trial court refused to give effect to the term in the one for $10,000, providing that the failure by Hagler to pay the premium due thereon should operate automatically to change the policy to one so limiting the company's liability as to entitle the beneficiaries named therein to demand anything against it only in the event Hagler died before the expiration of three years and eight months following such default, and in that event to demand more of the company than said principal sum, less loans made by the company on the policy, and rendered judgment for the plaintiffs .for said principal sum, less such loans, and for a sum in addition thereto, equal to one-half the amount of the premiums Hagler had paid on the policy before he entered into the contract authorizing its cancellation.

[2, 3] We were, and are, of the opinion that the term specified in said policy, on its reinstatement, should be given effect, that the trial court should have treated the policy as one for a definite term as stated, and that he erred when he rendered judgment against the company for such additional sum. We further were of the opinion that the contract whereby the policies were surrendered and canceled was valid until set aside, and that the company was not bound to recognize the policies as obligations on its part to pay plaintiffs anything until same were reinstated by the judgment of the court. We accordingly held that plaintiffs were not entitled to recover the penalty and attorney's fees claimed, nor interest on the amounts of the policies, during any of the time intervening between the day, to wit, May 21, 1912, when they furnished the company proof of Hagler's death and demanded payment of the policies, and the day, to wit, January 20, 1913, the judgment appealed from was rendered. In so holding we now think we erred. The statement in the opinion that "the contract canceling the policies was valid until set aside" is believed to be inaccurate so far as it might be construed to mean that the company was not bound to recognize a liability on its part to plaintiffs until the contract referred to was annulled by the judgment of a court. Facts existing, as found by the jury, which entitled plaintiffs to disaffirm the contract, when they elected to do so the company was bound by the terms of the policies. Its refusal then to pay the sums due on same entitled plaintiffs to interest on those sums from that date, and also to recover against the company the penalty and attorney's fees provided by the statute referred to in the opinion. Instead of being reformed by this court as it was, the judgment of the trial court should have been so reformed as to award to plaintiffs a recovery on account of the three policies for $5,000 each of the sum of $12,855, less $465.04, being the sum and interest thereon to May 21, 1912, paid to Hagler by the company at the time the policies were surrendered, leaving $12,389.96, to which should be added interest thereon from May 21, 1912, to .January 20, 1913, amounting to $493.46, making the amount recoverable on said policies, according to the terms thereof, $12,883.42, and as to award a recovery on the policy for $10,000 of the sum of $7,830, less $343.73, being the sum and interest thereon to May 21, 1912, paid to Hagler at the time this policy was canceled, leaving $7,486.27, to which should be added interest thereon from May 21, 1912, to January 20, 1913, amounting to $298.20, making the amount recoverable on said policy according to its terms $7,784.47. Having reach-

ed the conclusion, as stated, that plaintiffs on the findings made were lawfully entitled, at the time they did so, to wit, May 21, 1912, to demand of the company the payment of said sums of $12,389.96 and $7,486.27, aggregating $19,876.23, and that the company was bound, when said demand was made, to pay said sums, there appears to be no escape from the further conclusion that the statute referred to in the opinion is applicable to the case made, and that plaintiffs were entitled. to recover 12 per cent., amounting to $2,385.14, on said sums of $12,389.96 and $7,486.27, as a penalty, and also to recover "reasonable attorney's fees for the prosecution and collection of such loss."

[4] The jury found on uncontradicted testimony that such reasonable attorney's fees would be the sum of $5,000. The company attacks this finding and the judgment awarding it as excessive, but we have concluded we should not so hold. Therefore the motion of the plaintiffs for a rehearing will be granted, and the judgment heretofore rendered by us will be set aside, and the judgment of the court below will be so reformed as to award a recovery in favor of plaintiffs against the company for the sum of $28,053.03 and interest thereon from the 20th day of January, 1913, and, as so reformed, that judgment will be affirmed.

The motion of the company for a rehearing is overruled.